STATE OF NORTH CAROLINA v. PAUL RASMUSSEN

No. COA02-849

(Filed 1 July 2003)

**1. Motor Vehicles— driving while impaired—right to communicate with counsel, family, and friends**

A defendant charged with driving while impaired was not denied his statutory or constitutional rights to communicate with counsel, family, and friends, because: (1) defendant was advised at least three times of his right to an attorney but did not assert that right, and law enforcement officers were not required to assume that defendant wanted to speak to his friend as an attorney simply based on the fact that she was an attorney even though officers knew that fact; and (2) defendant's friend was provided with enough contact with defendant to allow her to form an opinion as to his impairment or lack thereof, and even if defendant's friend should have been allowed to witness the field sobriety tests, there was no prejudicial error since the trial court on its own motion suppressed the introduction of the test results at trial. N.C.G.S. §§ 15A-501, 20-16.2(a)(6); N.C. Const. art. I, § 23.

**2. Criminal Law— driving while impaired—motion for mistrial—jury deliberations past 5:00 p.m.—verdict not coerced**

The trial court did not abuse its discretion in a driving while impaired case by denying defendant's motion for a mistrial and did not commit plain error by failing to recess the trial proceedings until Monday morning, because: (1) defendant waived appellate review of the assignment of error that the jury deliberated past 5:00 p.m. when defendant failed to object; (2) the length of the deliberations did not have a coercive effect upon the jury when the trial court left the decision of whether to continue deliberations to the jury members; and (3) defendant's arguments concerning a particular juror's perceived distress that allegedly coerced her into finding defendant guilty to speed up the deliberations was merely speculation.

**3. Jury— numerical division regarding verdict—*Allen* instruction**

The trial court did not commit plain error in a driving while impaired case by inquiring into the numerical division of the jury

regarding its verdict and in its *Allen* instruction based on N.C.G.S. § 15A-1235, because: (1) the inquiry into the numerical division was not coercive and did not constitute an abuse of discretion by the trial court; and (2) the trial court did not deviate from the statutory language of N.C.G.S. § 15A-1235 in giving the *Allen* charge.

### 4. Motor Vehicles— driving while impaired—denial of motion to dismiss—written findings of fact and conclusions of law not required

The trial court did not commit reversible or plain error by allegedly failing to make adequate findings of fact and conclusions of law to support the order denying defendant's motion to dismiss the charge of driving while impaired, because: (1) there is no unresolved material conflict in the evidence, and there is no need to remand the case for written findings of fact and conclusions of law; and (2) defendant has waived any claim that the trial court was required to make written findings of fact and conclusions of law by not making a timely objection or requesting that the trial court reduce its findings and conclusions to writing.

Appeal by defendant from judgment entered 2 November 2001 by Judge Orlando Hudson in Wake County Superior Court. Heard in the Court of Appeals 27 March 2003.

*Attorney General Roy Cooper, by Special Deputy Attorney General Isaac T. Avery, III, and Assistant Attorney General Patricia A. Duffy, for the State.*

*George B. Currin for defendant appellant.*

McCULLOUGH, Judge.

Defendant Paul Rasmussen was tried before a jury at the 29 October 2001 Term of Wake County Superior Court after being charged with driving while impaired (DWI) and failing to drive at a speed that was reasonable and prudent under the circumstances (a moving violation infraction). The pertinent facts leading to this appeal are as follows: On 28 April 1999, defendant attended a business dinner in Chapel Hill, North Carolina. During the dinner, he consumed several glasses of wine. As he and his business companions left the restaurant, it was raining heavily. Defendant offered to follow Ms. Suzanne Markle (another attendee at the dinner) home to ensure she arrived safely. After leaving Ms. Markle's home in Cary, defendant

traveled on Harrison Avenue to the Interstate 40 ramp toward Raleigh. As he merged onto Interstate 40, defendant stated a large truck passed him and splashed his windshield with water. Defendant testified that he applied his brakes, but they locked up and the car spun to the left. The right rear end of defendant's car struck the back of another vehicle being driven by Mr. Sam Middleton. Defendant's car traveled across the road and went headfirst into the guardrail and ditch. Defendant called 911 to report the accident and told the dispatcher he smelled gasoline. Defendant also called Ms. Markle and asked her to come to the accident scene. Defendant then turned off the ignition, got out of the car and took an umbrella out of the trunk. He crossed Interstate 40 to check on Mr. Middleton and told him that the police and fire department had been called.

Trooper Thomas Garner of the North Carolina State Highway Patrol responded to the accident scene shortly after 11:00 p.m. and discovered a two-car collision. Trooper Garner talked to both drivers, determined they were uninjured, and asked them to sit in his patrol car so he could take their statements and obtain their insurance information. While the men were in the patrol car, Ms. Markle arrived and opened the vehicle's door to speak to defendant. She sat on the edge of the door and attempted to help defendant fill out his paperwork. Trooper Garner asked Ms. Markle if she was involved in or saw the accident; when she indicated she was not involved and did not witness the accident, he asked her to step away from the car. She complied.

Trooper Garner testified that, while he spoke to defendant, he noticed a strong odor of alcohol about him, saw that defendant's eyes were red and glassy, and noted that defendant's speech was slurred. Trooper Garner asked defendant if he had consumed any alcohol that evening, and defendant stated he had a couple of glasses of wine at dinner earlier that evening. Trooper Garner then administered an ALCO-SENSOR test to defendant. As a result of the test, Trooper Garner placed defendant under arrest for DWI and handcuffed him. Trooper Garner read defendant his *Miranda* rights, and defendant indicated he understood them. At trial, Trooper Garner testified he had formed the opinion that "the defendant did consume a sufficient amount of an impairing substance to cause an appreciable impairment of his mental and physical faculties."

Thereafter, Trooper Garner drove defendant to the City County Bureau of Investigation (CCBI) in Raleigh for processing. On the way, at defendant's request, Trooper Garner called Ms. Markle on defend-

STATE v. RASMUSSEN

[158 N.C. App. 544 (2003)]

ant's cell phone and gave her directions to the CCBI. Sometime during the drive, defendant told Trooper Garner that Ms. Markle was a corporate attorney. Upon arriving at the CCBI, defendant was taken before Ms. Holly Murphy, the chemical analyst. She read defendant his Intoxilyzer rights, then asked if he understood them, to which defendant replied yes. Ms. Murphy also asked defendant if he wanted to call a witness or attorney. Defendant stated he wanted to call Ms. Markle, who was a civil attorney. Ms. Murphy advised defendant that he could call anyone he wanted to witness the test and showed him where the telephone was located. After the observation period ended, Ms. Markle was brought into the room and witnessed Ms. Murphy administer the Intoxilyzer test to defendant. Defendant's alcohol concentration was 0.10 at 12:52 a.m.

While she waited to witness defendant's Intoxilyzer test, Ms. Markle had called an attorney who advised her to have defendant take an additional test. After defendant completed the first Intoxilyzer test (which consisted of two sequential readings), Ms. Markle told Ms. Murphy that defendant wanted to take another test. Ms. Murphy stated that she was not statutorily required to administer another test and refused to do so. She also explained that defendant had the right to take another test, but it would be on his own time and at his own expense. Ms. Markle was then escorted out of the Intoxilyzer room and waited for defendant to be released. Defendant was subsequently released by the magistrate at 1:30 a.m. and left the CCBI with Ms. Markle.

After a 3 March 2000 bench trial in district court, defendant was found guilty of both charges. Defendant appealed and was granted a jury trial *de novo* in superior court. On 12 March 2000, defendant filed a motion to dismiss the DWI charge on the ground that he was denied his right of access to friends and counsel under N.C. Gen. Stat. § 15A-501, U.S. Const. Amend. VI, and Article I, §§ 19 and 23 of the North Carolina Constitution. Defendant also filed a motion to suppress the results of the Intoxilyzer test administered the night of his arrest on the ground that the chemical analyst refused his request for a second test.

The trial court conducted a hearing at the 13 March 2001 Criminal Session of Wake County Superior Court and denied both of defendant's motions. However, on its own motion, the trial court did suppress the results of defendant's field sobriety tests because his attorney was not present during those tests. At the close of all the evidence, defendant moved to dismiss the charges for insufficiency of

the evidence. The trial court granted the motion to dismiss the DWI charge in part by ruling that the evidence was insufficient to submit the charge on the theory of appreciable impairment. The DWI charge was thereafter submitted to the jury solely on the theory that defendant had an alcohol concentration of 0.08 or higher. The jury determined defendant was not responsible for the moving violation infraction but was unable to reach a unanimous verdict on the DWI charge. The trial court declared a mistrial because the jury was hopelessly deadlocked.

Defendant's second trial took place during the 29 October 2001 Criminal Session of Wake County Superior Court. After deliberating, the jury found defendant guilty of the DWI charge and the trial court sentenced him to a suspended sentence of sixty days, unsupervised probation for twelve months, and required him to pay $292.00 in costs. Defendant appealed.

On appeal, defendant argues the trial court erred by (I) denying his motion to dismiss based on constitutional grounds; (II) denying his motion for a mistrial; (III) asking the jury about its numerical division on the verdict; and (IV) failing to make findings of fact and conclusions of law to support its order denying his motion to dismiss. For the reasons stated herein, we disagree with defendant's arguments and conclude he received a trial free from error.

## Motion to Dismiss

[1] By his first assignment of error, defendant contends the trial court erred in denying his motion to dismiss because he was denied his constitutional right to obtain witnesses in his behalf and his statutory right to communicate with counsel, family and friends. Specifically, defendant argues he should have been permitted to confer with Ms. Markle prior to the administration of the Intoxilyzer test, and that Ms. Markle should have been allowed to be present when he performed the field sobriety tests for Trooper Garner, after the Intoxilyzer test had been administered. Upon review, we disagree.

### (1) Right of Access to Counsel Before Intoxilyzer Test

Defendant readily concedes that criminal defendants have no *constitutional* right to confer with counsel before deciding to submit to a breathalyzer test. *Seders v. Powell, Comr. of Motor Vehicles*, 298 N.C. 453, 461-62, 259 S.E.2d 544, 550 (1979); *State v. Howren*, 312 N.C. 454, 455-56, 323 S.E.2d 335, 336-37 (1984) (explaining that administration of a breathalyzer test is not a critical stage of the prosecution

entitling a defendant to a constitutional right to an attorney). However, defendant contends that he maintained the *statutory* right to communicate with an attorney before submitting to a breathalyzer test pursuant to N.C. Gen. Stat. § 15A-501(5) (2001) and N.C. Gen. Stat. § 20-16.2 (2001). N.C. Gen. Stat. § 15A-501 states:

> Upon the arrest of a person, with or without a warrant, but not necessarily in the order hereinafter listed, a law-enforcement officer:
>
> * * * *
>
> (5) Must without unnecessary delay advise the person arrested of his right to communicate with counsel and friends and must allow him reasonable time and reasonable opportunity to do so.

N.C. Gen. Stat. § 20-16.2(a)(6) provides:

> (6) The person has the right to call an attorney and select a witness to view for him or her the testing procedures, but the testing may not be delayed for these purposes longer than 30 minutes from the time when the person is notified of his or her rights.

The only limitation on the statutory right to communicate with counsel, argues defendant, is that a criminal defendant may not delay the administration of the breathalyzer test for more than 30 minutes for the purpose of obtaining and communicating with an attorney. *Seders*, 298 N.C. at 460, 259 S.E.2d at 549. Defendant contends the evidence shows that he was denied his statutory right under N.C. Gen. Stat. § 15A-501(5) to communicate with Ms. Markle prior to deciding whether to submit to the Intoxilyzer test.

The burden of proving prejudice from a statutory violation is on defendant. N.C. Gen. Stat. § 15A-1443(a) (2001). "The defendant is not entitled to a new trial based on trial errors unless such errors were material and prejudicial." *State v. Alston*, 307 N.C. 321, 339, 298 S.E.2d 631, 644 (1983). Our standard of review is as follows:

> While charges pending against an accused may be dismissed for violations of his statutory rights, dismissal is a drastic remedy which should be granted sparingly. *See State v. Curmon*, 295 N.C. 453, 245 S.E.2d 503 (1978). Before a motion to dismiss should be granted, this court has held that it must appear that the statutory violation caused irreparable prejudice to the prepara-

tion of defendant's case. *State v. Knoll,* 84 N.C. App. 228, 352 S.E.2d 463 (1987).

*State v. Gilbert,* 85 N.C. App. 594, 596, 355 S.E.2d 261, 263 (1987).

The State argues, and we agree, that N.C. Gen. Stat. § 20-16.2 controls over N.C. Gen. Stat. § 15A-501(5) in this context. This is so because

> anyone who accepts the privilege of driving upon our highways has already consented to the use of a breathalyzer test and has no constitutional right to consult a lawyer to void that consent. . . .
>
> * * * *
>
> In view of this prior consent, we see no reasons why [the defendant] has any claim to consult counsel other than that provided for in G.S. 20-16.2(a)[(6)].

*Seders,* 298 N.C. at 462-63, 259 S.E.2d at 550-51. The trial court found that there was no statutory violation in this case. Ms. Markle testified that she did not tell anyone that she was an attorney; she described herself as defendant's "witness." Ms. Markle did, in fact, witness the administration of the Intoxilyzer test and had an opportunity to consult with defendant before the test was administered, but defendant did not request to see her prior to the administration of the test. Defendant's only argument is that he was prevented from conferring with Ms. Markle prior to administration of the test. During the hearing on defendant's pretrial motions, the following inquiry took place:

> THE COURT: Just wait just one second. Let me make sure I have the information I need. I need a little more information about how you described Ms. Markle to trooper—first to trooper Garner. I mean, do you know when it was and by what words you used to let him know that this was an attorney here on your behalf?
>
> THE WITNESS: I don't recall if I said my friend or attorney, lawyer; whether she was there to be of support to me and to help me out. I don't recall if I distinctly said friend, lawyer, attorney. I just don't.
>
> THE COURT: All right. How about after you got to the Public Safety Center and you're in the breathalyzer room and breathalyzer operator's advising you of your rights. Do you know when

**STATE v. RASMUSSEN**

[158 N.C. App. 544 (2003)]

you made her aware that Ms. Markle, who was outside, not only was there as a friend, potential witness and support, but also she was there as an attorney?

THE WITNESS: I don't recall if that ever came up, that she was an attorney, I don't know if she declared that she was an attorney or that I said it, I really don't. If I may say, when you're in that breathalyzer processing area, you don't get to talk much, you're just standing there. It's, boom, they don't want to hear from anybody.

THE COURT: I understand. I understand that, they're going through protocol.

THE WITNESS: Yes, sir.

THE COURT: Okay. But you have stated you never said, hey, guys, you know this right down here about conferring with a lawyer, my lawyer's outside, her name is Ms. Markle. I would like to talk to her. Did you ever clearly say that to anybody in authority who would have then had to make a decision about whether or not they were going to let you confer with her?

THE WITNESS: I believe that Officer Garner was aware.

THE COURT: I'm not talking about what you believe Officer Garner was aware of, I'm asking you whether you, yourself, ever clearly said to either him or the breathalyzer operator, I want to confer with a lawyer, my lawyer is outside. I want to talk to her before I take the test. I want to talk to her before I answer any questions, anything like that. So that they were on notice that you were exercising your right to counsel, and that they had a legal obligation to make her available to you immediately. Any words that would suggest that to them?

THE WITNESS: Again, if I may say, Your Honor, you're not given any chance to talk about anything. They don't want to talk to you, they don't want to hear you, anything else.

THE COURT: Sir, no matter what they want, whether they advise you of your rights, if you exercise one of those rights in a clear unequivocal way, by law they must.

THE WITNESS: Well—

THE COURT: They must. They must comply.

THE WITNESS: I believe they knew she was my attorney. I wanted her there. They would not—did not have the opportunity to speak to her because she was ushered out immediately after the test.

THE COURT: I understand that. And I don't quarrel with the fact that you believe they knew that. I want to know how you communicated that to them so that they believed that.

THE WITNESS: Well, when I volunteered for the first tests, I said that I wanted Ms. Markle there, I was told that she was not going to be there, I said she's my attorney. Officer Garner knew that at that instant, I was not allowed to have her there.

THE COURT: That was after you [had] taken the breathalyzer test, after you had also requested another test that had been done.

THE WITNESS: Yes, and I don't recall if I—the answer to that question, just because of what goes on.

THE COURT: I mean, I understand this was a—this was a very unusual situation for you, and just some time later, I'm asking you a lot of specific questions, but that's what I need.

THE WITNESS: Yes, sir.

THE COURT: Just trying to get your best recall. All right. Any other questions based on that?

Shortly thereafter, the following exchange took place:

Q. [DEFENSE ATTORNEY MR. PETTY]: Do you specifically recall requesting your attorney, Mr. Rasmussen?

A. Yes.

MR. PETTY [DEFENSE ATTORNEY]: No further questions, Your Honor.

THE COURT: Okay. Any other questions?

MR. MANGUM [PROSECUTOR]: No, not at this point.

THE COURT: Okay. Well, I mean, you recall that a moment ago, do you now recall when it was that you requested to confer with Ms. Markle as your attorney?

THE WITNESS: In the presence of Ms. Murphy. She took the notes.

STATE v. RASMUSSEN

[158 N.C. App. 544 (2003)]

THE COURT: Do you know whether—do you know before—whether it was before the test, after the test when you requested the second test immediately before the physical test, or do you recall?

THE WITNESS: The exact instance?

THE COURT: Just trying to get some idea during this whole time frame when that happened.

THE WITNESS: Well, it was—

THE COURT: If you can remember. If you can't, obviously, you can't.

THE WITNESS: It was obviously before the request for second test was denied.

THE COURT: Okay.

THE WITNESS: That's obvious.

THE COURT: Okay. All right.

On cross-examination, Ms. Markle testified as follows:

Q. At any point did you—do you recall Mr. Rasmussen asking for the opportunity to speak with you before he took those tests?

A. I did not hear him ask that, no, I don't recall that.

Q. At any time did you have particular—a request to have a chance to talk with Mr. Rasmussen?

A. No.

Defendant did not identify Ms. Markle as his attorney and did not affirmatively ask to speak to her before the Intoxilyzer test was administered. To invoke the right to counsel, "the suspect must unambiguously request counsel. . . . Although a suspect need not 'speak with the discrimination of an Oxford don,' he must articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney." *Davis v. United States*, 512 U.S. 452, 459, 129 L. Ed. 2d 362, 371 (1994) (citations omitted). As defendant did not make an unambiguous request to confer with Ms. Markle, the trial court correctly determined there was no violation of defendant's statutory right of access to counsel prior to administration of the Intoxilyzer test.

**(2) Statutory Right to Communicate with Family and Friends and Constitutional Right to Obtain Witness Testimony**

Defendant also argues he was prevented from communicating with family and friends and obtaining witnesses and exculpatory evidence after the Intoxilyzer test, in violation of both N.C. Gen. Stat. § 15A-501(5) and Article I, § 23 of the North Carolina Constitution. Defendant notes that, in the case of a DWI charge, "intoxication is an essential element" and time is of the essence in allowing him access to his friends and family, so that they can make observations about his condition and possibly provide him with exculpatory evidence for use in his defense. *See State v. Hill*, 277 N.C. 547, 178 S.E.2d 462 (1971); and *State v. Knoll*, 322 N.C. 535, 369 S.E.2d 558 (1988). Defendant contends he asked for Ms. Markle to be present for the field sobriety tests and argues that, because he was arrested and charged with DWI at the accident scene, his statutory and constitutional right to communicate with family and friends attached at that time, such that Ms. Markle was fully entitled to observe the field sobriety tests. Again, we disagree.

Upon review, we note that defendant was not denied his right to communicate with family and friends because Ms. Markle was in contact with him from the time she arrived at the accident scene around 11:35 p.m. until he was released around 1:30 a.m. She saw defendant at the dinner before the accident, at the accident scene, in the Intoxilyzer room, and at the time of his release. These instances provided Ms. Markle with enough contact with defendant to allow her to form an opinion as to his impairment or lack thereof. She also testified as to her observations at his trial, and stated that he "looked fine," had no odor of alcohol about his person, and did not appear flushed, glassy-eyed, or light-headed.

We further note that, even if Ms. Markle should have been allowed to witness the field sobriety tests, there is no prejudicial error because the trial court, on its own motion, suppressed the introduction of the field sobriety test results at trial. The trial court also dismissed the appreciable impairment theory of DWI and submitted the issue to the jury solely on the theory that defendant had an alcohol concentration of 0.08 or higher. As defendant has demonstrated no prejudicial error, *see Gilbert*, 85 N.C. App. at 597, 355 S.E.2d at 263, he is not entitled to a new trial.

In sum, we believe the trial court properly determined that defendant was not entitled to have the charges against him dis-

missed. Defendant did not indicate that Ms. Markle was his attorney; instead, she was a witness. Ms. Markle was permitted to witness the Intoxilyzer test and could have spoken to defendant before the test was administered had defendant clearly made such a request. Defendant was advised at least three times of his right to an attorney, but did not assert that right. Furthermore, we do not believe that the law enforcement officers were supposed to assume that defendant wanted to speak to Ms. Markle as his attorney simply because she was an attorney and they knew that fact. In the absence of a clear request by defendant that he wished to speak to his attorney, we discern no error by the trial court. Accordingly, defendant's first assignment of error is overruled.

## Motion for Mistrial

**[2]** Defendant next argues that the trial court abused its discretion by denying his motion for a mistrial and committed plain error by failing to recess the trial proceedings until Monday morning. According to defendant, the totality of the circumstances showed that the jury verdict was the result of coercion placed upon the jury by the trial court, which resulted in a denial of his constitutional rights to a fair trial and due process. Specifically, defendant points to (1) the length and lateness of the jury's deliberations, and (2) the situation involving Juror No. 9. Upon review of these arguments, we discern no errors by the trial court.

> It is well established that where matters are left to the discretion of the trial court, appellate review is limited to a determination of whether there was a clear abuse of discretion. A trial court may be reversed for abuse of discretion only upon a showing that its actions are manifestly unsupported by reason. A ruling committed to a trial court's discretion is to be accorded great deference and will be upset only upon a showing that it was so arbitrary that it could not have been the result of a reasoned decision.

*White v. White*, 312 N.C. 770, 777, 324 S.E.2d 829, 833 (1985) (citations omitted). "In order to preserve a question for appellate review, a party must have presented the trial court with a timely request, objection or motion, stating the specific grounds for the ruling sought if the specific grounds are not apparent." *State v. Eason*, 328 N.C. 409, 420, 402 S.E.2d 809, 814 (1991). Here, defendant did not object to the jury deliberating past 5:00 p.m., and has therefore waived appellate review of this assignment of error.

Plain error review has only been applied to jury instructions and to evidentiary matters. *State v. Odom*, 307 N.C. 655, 660-61, 300 S.E.2d 375, 378-79 (1983); *State v. Black*, 308 N.C. 736, 740-41, 303 S.E.2d 804, 806-07 (1983). To show prejudicial error warranting a new trial, defendant must show that " 'there is a reasonable possibility that, had the error in question not been committed, a different result would have been reached at the trial. . . . The burden of showing such prejudice . . . is upon the defendant.' " *State v. Ratliff*, 341 N.C. 610, 617, 461 S.E.2d 325, 329 (1995) (quoting N.C. Gen. Stat. § 15A-1443(a) (1988)).

In the present case, defendant's motion for a mistrial was based on the fact that the jury was allowed to deliberate past 5:00 p.m. and the trial court did not recess the proceedings. N.C. Gen. Stat. § 15A-1235 (2001) states:

> (c) If it appears to the judge that the jury has been unable to agree, the judge may require the jury to continue its deliberations and may give or repeat the instructions provided in subsections (a) and (b). The judge may not require or threaten to require the jury to deliberate for an unreasonable length of time or for unreasonable intervals.

> (d) If it appears that there is no reasonable possibility of agreement, the judge may declare a mistrial and discharge the jury.

"[T]he action of the judge in declaring or failing to declare a mistrial [under N.C. Gen. Stat. § 15A-1235] is reviewable only in case of gross abuse of discretion." *State v. Darden*, 48 N.C. App. 128, 133, 268 S.E.2d 225, 228 (1980). Our review must take into account the totality of the circumstances. *State v. Patterson*, 103 N.C. App. 195, 201, 405 S.E.2d 200, 204, *aff'd*, 332 N.C. 409, 420 S.E.2d 98 (1992).

At 3:09 p.m. on a Friday afternoon, the jury began deliberating the single issue of whether defendant was guilty of DWI. Over the course of the afternoon, the jury sent questions to the trial court, which were duly answered. Around 5:00 p.m., after answering a question posed by the jury, the trial court asked if a preliminary vote had been taken, but did not ask how the votes were actually being cast. After the jury foreman indicated a vote had been taken, the trial court tried to determine whether the jurors wanted to leave or stay:

> THE COURT: We talked a little bit about this on yesterday. We just want to get a feel about what y'all thinking, Mr. Foreman.

STATE v. RASMUSSEN

[158 N.C. App. 544 (2003)]

Why don't we do it this way. Why don't you talk to the jurors and see what it is they want to do. Five o'clock is normally the time that we would close court, but you know, we want to get the case done if we can do it today. And I'm not asking you to do it today, but I am asking you how long you want to be here today. Kind of the same question.

A JUROR: What time does the parking lot close across the street?

THE COURT: I think the parking lot will be open, the parking lot will be open. I believe that they will just—

THE FOREPERSON: I think I saw a sign that the gate closed at six forty-five.

THE COURT: I think you can get out. I'm not aware that they won't let you out.

THE FOREPERSON: Well, I think we're kind of undecided on that. Also I think there's a couple of folks that are ready to go and a lot of folks that don't want to come back Monday. So is that a fair statement?

THE COURT: Well, y'all need to work it out. Y'all need to tell us what you want to do.

THE FOREPERSON: Why don't we try a few more minutes.

THE COURT: Why don't we do this, if that's what you want to do you want to try a few, just go back there for a couple minutes, tell us that you want to try for a few minutes okay.

In response to some inquiries, the trial court told the jurors that if they decided to continue deliberating, they would be given access to phones to notify their families that they were staying late. The jury resumed deliberations at 5:00 p.m. and returned to the courtroom at 5:05 p.m. At that time, the foreperson stated:

THE FOREPERSON: We have agreed that we all would like to finish this today if possible. We would like another half hour or two to discuss this to see if we could come to a conclusion.

The trial court called the jury back into the courtroom at 5:55 p.m. and stated:

THE COURT: All right. Mr. Foreman, has the jury reached a unanimous verdict on the issue?

THE FOREPERSON: No, we have not.

THE COURT: Mr. Foreman, do you recall your last vote?

THE FOREPERSON: Yes, I do.

THE COURT: I just want you to give me the numbers, not the way it's going for instance.

THE FOREPERSON: Ten two.

THE COURT: All right. Mr. Foreman, do you believe that with further deliberations the jury would reach a unanimous verdict?

THE FOREPERSON: I am not sure; is that fair? I'm not sure.

THE COURT: I'm going to read you some language and ask the jury to consider it and then we'll make a decision about what we're going to do.

The trial court then read the *Allen* charge contained in N.C. Gen. Stat. § 15A-1235 and the jury resumed deliberations at 5:57 p.m. Some time later, the trial court again brought the jury into the courtroom to gauge their progress, and the foreperson indicated they were "very close" to reaching a verdict and could reach a verdict with further deliberations. At 6:25 p.m., the jury returned a guilty verdict.

We note that the jury deliberated only one and one-half hours after 5:00 p.m. The aforementioned colloquies indicate that the trial court properly left the decision of whether or not to continue deliberations to the jury members. *See State v. Bussey*, 321 N.C. 92, 97, 361 S.E.2d 564, 567 (1987). We therefore conclude the length of the deliberations did not have a coercive effect upon the jury.

Defendant also argues that the trial court's failure to declare a mistrial was error because Juror No. 9 had "emotional and unresolved concern over the well-being of her daughter, who was waiting outside in the dark with no knowledge of the whereabouts of her mother." Again, we disagree.

After the jury foreman told the trial court the jury was "very close" to a verdict (shortly after 6:00 p.m.), and after the jury resumed deliberations, the trial court asked the deputy to relate what Juror No. 9 had said to him:

STATE v. RASMUSSEN

[158 N.C. App. 544 (2003)]

THE COURT: All right Mr. Deputy, what did juror number nine say?

* * * *

THE DEPUTY: Apparently her daughter is waiting outside. Wants her to be contacted to let her know she's still here in deliberation.

THE COURT: Did she tell you where she was?

THE DEPUTY: Yeah, in front of the sheriff's office.

THE COURT: Can you let somebody know that?

THE DEPUTY: I think I'm the only one here. I know I am. If I can go down there, I'm the only one left.

THE COURT: Right. She tell you what her name is?

THE DEPUTY: Yeah, she told me what she was driving.

THE COURT: Okay, why don't you go ahead.

Defendant moved for a mistrial due to Juror No. 9's perceived "distress," which he believed coerced her into finding him guilty to speed up the deliberations. The trial court considered defendant's argument and denied the motion. Upon review, we believe Juror No. 9 simply asked the deputy to relay a message to her daughter that she was still involved in deliberations with the jury. If she was concerned for her daughter's safety, the deputy was an armed officer who could help keep her daughter safe. Moreover, the record does not reveal which way Juror No. 9 voted, and defendant's arguments are therefore merely speculative. After carefully reviewing the transcript and considering the circumstances, we believe defendant's arguments are meritless, and this assignment of error is overruled.

## Trial Court's Inquiry of Jury's Numerical Division

[3] In a related assignment of error, defendant contends the trial court committed plain error by inquiring into the numerical division of the jury regarding its verdict and in its subsequent *Allen* instruction based on N.C. Gen. Stat. § 15A-1235. Specifically, defendant contends these actions were coercive under the totality of the circumstances and violated his state and federal constitutional rights to a trial by jury and due process of law by causing the jury to enter a unanimous guilty verdict. Upon review, we disagree.

[T]he defendant is entitled to a new trial if the circumstances surrounding jury deliberations

> might reasonably be construed by [a] member of the jury unwilling to find the defendant guilty as charged as coercive, suggesting to him that he should surrender his well-founded convictions conscientiously held or his own free will and judgment in deference to the views of the majority and concur in what is really a majority verdict rather than a unanimous verdict.

*State v. Dexter*, 151 N.C. App. 430, 433, 566 S.E.2d 493, 496, *aff'd*, 356 N.C. 604, 572 S.E.2d 782 (2002) (quoting *State v. Roberts*, 270 N.C. 449, 451, 154 S.E.2d 536, 538 (1967)).

> It is true that our constitution has been interpreted to require a jury of twelve and a unanimous verdict. This Court has also recognized the importance of protecting jury deliberations from influences which deprive jurors of their freedom of thought and action. We do not consider questions concerning the division of the jury to be a *per se* violation of Art. I, § 24 [of the North Carolina Constitution] when the trial court makes it clear that it does not desire to know whether the majority is for conviction or acquittal. Such inquiries are not inherently coercive, and without more do not violate the right to trial by jury guaranteed by the North Carolina Constitution. The appropriate standard is whether in the totality of the circumstances the inquiry is coercive.

*State v. Fowler*, 312 N.C. 304, 308-09, 322 S.E.2d 389, 392 (1984) (citations omitted). The making of such inquiry lies within the sound discretion of the trial judge. *State v. Mann*, 317 N.C. 164, 176, 345 S.E.2d 365, 372 (1986).

Defendant concedes that the trial court's instructions and inquiry into the numerical division of the jury may have been insufficient to coerce a unanimous verdict in this case. Defendant therefore seeks to bolster the perceived coerciveness by pointing to several "coercive circumstances" he believes existed at the time: (1) the trial court's statement to the jury that it wanted "to get the case done if we can do it today[]"; (2) the fact that the jury was asked to deliberate after normal hours on a Friday evening; (3) the fact that the trial court indicated its preference that the case be concluded on Friday when it gave the *Allen* charge; (4) the possible problems regarding closure of

the parking lot; and (5) the situation involving Juror No. 9. Defendant contends these circumstances pitted the jury "against the clock" and created a coercive environment which prejudiced him and entitled him to a new trial.

After consideration of the transcript, we believe the circumstances were not coercive. As previously noted, the inquiry into the jury's numerical division was not coercive and did not constitute an abuse of discretion by the trial court. Additionally, the trial court did not deviate from the statutory language of N.C. Gen. Stat. § 15A-1235 in giving the *Allen* charge. "The purpose behind the enactment of N.C.G.S. § 15A-1235 was to avoid coerced verdicts from jurors having a difficult time reaching a unanimous decision." *State v. Evans*, 346 N.C. 221, 227, 485 S.E.2d 271, 274 (1997), *cert. denied*, 522 U.S. 1057, 139 L. Ed. 2d 653 (1998). The trial court accomplished that goal through its instruction. As we discern no error in the trial court's actions, this assignment of error is overruled.

## Trial Court's Order

[4] In his final assignment of error, defendant contends the trial court committed reversible and plain error by failing to make adequate findings of fact and conclusions of law to support the order denying his motion to dismiss. We do not agree.

"When a defendant alleges he has been denied his right to communicate with counsel, family, and friends, the trial court must conduct a hearing on defendant's motion to dismiss and make findings and conclusions." *State v. Lewis*, 147 N.C. App. 274, 277, 555 S.E.2d 348, 351 (2001). "Generally, when a trial court fails to make required findings of fact, the case must be remanded to the trial court for entry of findings. However, when the evidence in the record as to a finding is not controverted, remand is not required." *Pitts v. American Sec. Ins. Co.*, 144 N.C. App. 1, 18, 550 S.E.2d 179, 192 (2001), *aff'd*, 356 N.C. 292, 569 S.E.2d 647 (2002) (citation omitted). Stated another way, "[i]f there is not a material conflict in the evidence, it is not reversible error to fail to make such findings because [the appellate court] can determine the propriety of the ruling on the undisputed facts which the evidence shows." *State v. Lovin*, 339 N.C. 695, 706, 454 S.E.2d 229, 235 (1995). There is no statutory authority which requires the trial court to make written findings of fact and conclusions of law in this instance. The transcript reveals the following relevant statement by the trial court, after it heard the testimony on defendant's motion to dismiss:

STATE v. RASMUSSEN

[158 N.C. App. 544 (2003)]

The standard the Court needs to find the facts in support of the ruling, the court finds the facts to be true as testified to by all witnesses who testified on behalf of the State, and also the testimony of Suzanne Markle, Court finds also to be true for purposes of making this decision. I do not find based on the Defendant's blood alcohol reading, on his recall, limited recall of the event, I do not find his testimony to be entirely credible to the extent that I can rely upon it in making this decision, to the extent there's some conflict with the testimony of the other witnesses, then I accept their testimony as more accurate and more truthful than his.

In short, the trial court stated it considered the evidence and found the testimony of other witnesses more credible than defendant's. After reviewing this case, we hold there is no unresolved material conflict in the evidence, and we see no need to remand the case for written findings of fact and conclusions of law. *See State v. Major*, 84 N.C. App. 421, 352 S.E.2d 862 (1987).

We also agree with the State that defendant has waived any claim that the trial court was required to make written findings of fact and conclusions of law by not making a timely objection or requesting that the trial court reduce its findings and conclusions to writing. *See* N.C.R. App. P. 10(b)(2) (2002). Accordingly, defendant's final assignment of error is overruled.

Upon careful review of the record, transcript, and the arguments presented by the parties, we conclude defendant received a fair trial, free from error.

No error.

Judges McGEE and LEVINSON concur.